FILED
SALINE COUNTY
CIRCUIT CLERK

2019 MAY -1 PM 3: 24

BY:

## IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS
### CIVIL DIVISION

American Tiger Firearms LLC,
Farm Diva LLC, and
First Shot, LLC
**on behalf of themselves and all others similarly situated,**

**PLAINTIFFS**

VS.                       CASE NO. 63CV-19-505-3

Facebook, Inc. and
Facebook Payments Inc.

**DEFENDANTS**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

American Tiger Firearms LLC, Farm Diva LLC, and First Shot, LLC ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action and demand for jury trial against Facebook, Inc. and Facebook Payments, Inc. (collectively, "Defendant"), and state and allege, upon personal knowledge as to themselves and otherwise upon information and belief, as follows:

## INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves and other commercial marketers in Arkansas who use Defendant's services (the "Class") and who (a) have suffered and continue to suffer arbitrary or capricious blocking by Defendant of their advertising on their Facebook Apps, and (b) have suffered and continue to suffer as a result of Defendant's pattern and practice of favoring large marketers over smaller ones.

*Defendant's Social Networking Monopoly*

2.      Defendant owns and controls the world's three largest social-networking sites that

together boast more than two billion users. Computer software applications have become known as "apps," and apps are downloaded by those two billion users to their respective mobile devices and thus become a "social network" that is the most powerful advertising platform in the world today. More than 1.5 billion people use the Facebook app every day, and more than 2.7 billion people use the Defendant's group of apps (which group includes Facebook, Instagram, WhatsApp, Facebook Messenger, and Audience Network; collectively, all of these apps are referred to herein as the "Facebook Apps"). More than 90% of all mobile device users in the United States access the Facebook mobile social networking app in a given month, and approximately 60% of all mobile device users in the United States access each of the Defendant's "Instagram" and "Facebook Messenger" social networking apps in a given month. For perspective, while Facebook owns and controls the top three most-used social networking apps in the United States, the fourth most-used, Twitter, is only visited by 38% of all mobile app users in the United States in a given month. All Facebook Apps, as owned and controlled by the Defendant, have the dominant market share of the social network advertising market, thus constituting the quintessential monopoly as defined in Arkansas law (*See* A.C.A. § 4-75-301).

3.     According to the Defendant, almost the entirety of Defendant's revenues come from the sale of commercial advertising services.   Defendant uses its market dominance to its great advantage in selling advertising functionality only on Defendant's terms and conditions. Defendant emphasizes to its customers, the marketers, that by using the Facebook Apps they are able to target their customers, followers, and prospective customers and followers based upon the personal data the Defendant acquires about those same commercial users, the commercial users' networks of customers and followers, and other data Defendant collects from any user of one or more of the Facebook Apps. In 2018, Facebook received almost $34 billion in advertising revenue

Saline County, AR          CTY 000000119422          2 of 41

on a worldwide basis, and for the fourth quarter of 2018 Facebook's revenue grew to nearly $17 billion. By any measure, Defendant's dominance of commercial social networking is increasing. If Plaintiffs and the Class members wish to advertise on social networking media, there is no effective alternative to using the Facebook Apps.

### Marketing Using the Facebook Apps

4.      Defendant sells special advertising methods, labelled by Defendant as "Business Tools", to the Plaintiffs and the Class members. Plaintiffs and Class members use the Business Tools to place ads for their businesses on the Facebook Apps. An example of a Business Tool is a "boost", which entails posting on a business's Facebook page, targeting a specific audience, and paying Defendant a fee to push the posting – or content – to the pages of the targeted audiences.

5.      Each network created by the work and expense of a commercial marketer such as the Plaintiffs and the Class members has significant inherent value, not only to the business that created its network but also to Defendant. Defendant instructs and encourages its customers, commercial marketers such as the Plaintiffs and the Class members, to build networks of people who, when using the Facebooks Apps, indicate that they "Like" the advertising and the businesses. Because of the viral nature of building a social network, a marketer's exposure on the Facebook Apps grows exponentially; every time someone "Likes" a marketer's page or something on it, that person exposes the page or the thing on it to all of that person's friends who are also using the Facebook Apps, and they in turn have the opportunity to expose it to their friends. When people "Like" a marketer's  page or its content, that person's friends will notice, either in advertisements appearing on their screens when using the Facebook Apps or on the "News Feeds" they receive when using the Facebook Apps. Since friends often share common interests, when someone likes a product or business, that person exposes it to other people who are more likely to have similar

3

preferences than someone picked at random. In this way, a business marketer creates its own network, using the Business Tools to target the people who are most likely to be interested in its business, its services, and its products.

6.     Facebook users who "Like" a marketer's Facebook page receive updates about that page in their News Feeds. In this way, they have the opportunity to stay informed about a business marketer and can even engage in conversations with that marketer using the Facebook Apps. This builds a customer community around the marketer's page and generates customer loyalty; at the same time the marketer's network becomes accessible to Defendant, which in turn sells access to that network to other marketers, including those who compete with the marketer who built the original network. The proof of a marketer's marketing effectiveness using the Facebook Apps is in the size of a marketer's network. People who "Like" a marketer's page and their friends are more likely to visit the marketer's website, visit the marketer's business (in person or virtually), and purchase its products or services. When a person who uses the Facebook Apps "Likes" a webpage, that person is signing up for a relationship with that marketer.

7.     The size and quality of the social networks established by the respective time, expense, and effort of the Plaintiffs and Class members correlate to a significant portion of the revenue of their respective businesses. Advertising using the Defendant's Business Tools drives sales. As a result, access to the social network created by businesses such as those of the Plaintiffs and Class members becomes increasingly valuable, both to the Plaintiffs and Class members as well as to Defendant.

*Defendant's Unlawful Practices and Harm to the Plaintiffs and Class Members*

8.     Defendant states on its website that all marketers must comply with its numerous published rules (labelled by Facebook as "Advertising Policies", "Commerce Policy",

4

"Commercial Terms", "Community Standards", and "Terms of Service"; collectively, the "Facebook Commercial Policies"). In reality not all commercial marketers must comply with the Facebook Commercial Policies; Defendant does not enforce the Facebook Commercial Policies uniformly against all commercial marketers, and Defendant's lack of uniform enforcement is particularly evident as against larger commercial marketers who pay Defendant more than the Plaintiffs and Class members pay Defendant.

9.      While encouraging the Plaintiffs and Class members to build a social network, given the nature of social network advertising and Defendant's thorough knowledge of the workings of the networks created on the Facebook Apps, Defendant is actually using the Plaintiffs and Class members to grow Defendant's network, which Defendant monetizes by selling access to other commercial marketers who compete with the Plaintiffs and Class members.  The businesses to which Defendant sells the social networks built by the Plaintiffs and Class members are larger and, directly or indirectly, competitors of the Plaintiffs and Class members.  When Defendant denies, for any reason, access by the Plaintiffs and the Class members to the networks they built, but simultaneously sells access to others to those same networks, Defendant is favoring larger marketers that pay Defendant more money.

10.      Although the Plaintiffs and the Class members comply with the Facebook Commercial Policies, their advertisements, or even their access to their respective networks, are blocked by Defendant.  At the same time Defendant allows access the networks built by the Plaintiffs and the Class members to larger marketers who are advertising using the Business Tools in the same manner.  Defendant blocks the content attempted by the Plaintiffs and the Class members while simultaneously allowing the larger, favored commercial marketer to post the same content.  By its conduct Defendant demonstrates that the Facebook Commercial Policies do not

5

apply to the to the larger commercial marketers; for the Plaintiffs and the Class members, either Defendant (a) capriciously and arbitrarily applies those policies only to them or (b) intentionally holds the larger commercial marketers to a less arduous standard; regardless as to which, the negative effects upon the Plaintiffs and the Class members are the same.

11.     When Defendant denies, for any reason, access by the Plaintiffs and the Class members to the networks they built, Defendant is denying them access to a public utility. If Defendant's denials of service are not arbitrary and capricious, then they are intentional. In either case, Defendant's denial of service causes an economic harm to the Plaintiffs and the Class members as they are denied access or use of an essential advertising medium in which they have previously invested time and money and upon which they have come to rely. It takes thousands of Dollars and months, or even years, to develop a large number of "Likes" and "Followers" using the Facebook Apps; Defendant's denial of access (to the public utility - the Facebook Apps - on which the Plaintiffs and Class members rely) economically harms the Plaintiffs and Class members in much the same manner as would denial of broadcast radio advertising, telecommunications connectivity, electricity, or water by the providers of those public utilities.

12.     In first enticing the Plaintiffs and Class members to commence their use of the Facebook Apps, Defendant described the Facebooks Apps as a demonstrably and measurably effective: "Get personal with one of the world's biggest communities. Communicate with people in familiar ways on Facebook. Whether your business is global or rooted in a local community, you can find your customers here." [and] "Facebook ads work because they're relevant for people, and easy to create and measure for businesses." (from Defendant's homepage, https://www.facebook.com/business ). Having no reasonable alternative to doing business with Defendant due to the size and ubiquity of the Facebook Apps, the Plaintiffs and the Class members

6

then become dependent upon the Facebook Apps and completely at risk for the adverse consequences of Defendant's anticompetitive decisions, or whims, to provide, or not provide, access by the Plaintiffs and Class members to their respective networks on the Facebook Apps.

13.     Using its near-absolute market dominance, Defendant has assumed a role of controlling a material segment of commercial advertising in America, deciding from day-to-day which types of businesses can advertise using the Facebook Apps and which cannot. Even among competitors within categories of advertising allowed by Defendant, Defendant picks and chooses favored customers (often its larger preferred customers) and allows them to continue advertising using the Facebook Apps in spite of a supposed categorical ban; at the same time, the Plaintiffs and Class members (most often Defendant's smaller customers), which do not have executives who have the title "Facebook Advertising Manager" or the like, have their advertising blocked by Defendant. Two comparisons illustrate the discriminatory treatment of the Plaintiffs and Class members by Defendant:

> *First Comparison:* Exhibit A is a listing of ads for concealed carry permit classes that were attempted by Plaintiff American Tiger Firearms LLC and blocked by Defendant because the ads, according to Defendant, "might lead to the use of firearms"; the examples of contemporaneous postings that advertise firearms and training classes that were posted to Facebook attached at Exhibit B were undertaken by marketers such as Hyatt Guns (which advertises itself as America's largest gun store) and four randomly selected manufacturers of firearms, all of whom are large and well respected in America: Colt, Henry Repeating Arms, Ruger, and Winchester. Beyond the size of Plaintiffs American Tiger Firearms LLC compared to the sizes of the group of advertisers represented in Exhibit B, there are no

7

material differences in the core businesses of any of them (*i.e.,* they all are engaged in the distribution and sale of firearms).

*Second Comparison*: Exhibit C is a short compendium of postings attempted by Plaintiff Farm Diva LLC that were denied by Defendant (*quoting Defendant*) "for failure to follow Facebook's Advertising Policies" in that they "promote the sale or use of weapons, ammunition ..."; compare those to the contemporaneous examples in Exhibit D from competing marketers named Bullet Designs, Gun Goddess, Jectz Bullet Jewelry, High Caliber Creations, and The Well Armed Woman LLC; again, there are no material differences in the ads of any of these marketers, whose ads were allowed by Defendant, and the ads of Plaintiff Farm Diva LLC, whose ads were rejected by Defendant.

14.     Defendant also retroactively blocks previously approved ads, supposedly to conform, retroactively, to its then-current position regarding an ad.

15.     While a specific ad or total access is denied to the Plaintiffs and the Class members, Defendant nevertheless continues to (a) make the Plaintiff's and Class member's networks available to their competitors, and (b) use the networking data from the networks built by the Plaintiffs and the Class members.

16.     There is no reasonable functional alternative to the Facebook Apps available for digital social networking advertising for the Plaintiffs and the Class members. The Facebook Apps are the essential medium for businesses wishing to launch and maintain a social network advertising program, but the Plaintiffs and the Class members fear Defendant's regulation of their advertising, or worse, denial of all access to their accounts on the Facebook Apps. The unlawful behavior is so common on the part of the Defendant that the term "Facebook Jail" has been coined

Saline County AR        CTY 000000119422        8 of 41

to refer to those marketers who, for whatever reason, have had their content and even their entire pages blocked by Defendant for any period of time.

17.     Accordingly, to give the Plaintiffs and the Class members access to the use of their accounts on the Facebook Apps, the Plaintiffs bring this action against Defendant on behalf of themselves and the proposed Class members requesting (a) declaratory judgment that Defendant is a non-regulated public utility under Arkansas law and as such is not afforded the protections from prosecution as a monopoly that a regulated utility has, (b) declaratory judgment that Defendant is an unlawful monopoly under Arkansas law, (c) the Court to enjoin Defendant to manage the use of the public utility (that is, the Facebook Apps) in a manner consistent with its legal duties as a non-regulated public utility, (d) the Court to enjoin Defendant to conduct itself generally as a public utility in accordance with the duties and obligations of a public utility and specifically not to discriminate in favor of larger commercial marketers against smaller commercial marketers such as the Plaintiffs and the Class members, and (e) the Court to enjoin Defendant from terminating the Plaintiffs' accounts on the Facebook Apps in retaliation for the commencement of this action.

## THE PARTIES

18.     Plaintiff American Tiger Firearms LLC is a limited liability company organized under the laws of Arkansas and conducting a business under the name of American Tiger Firearms in Pulaski County, Arkansas. Plaintiff American Tiger Firearms LLC operated its business during the relevant time hereto and continues to operate it.

19.     Plaintiff Farm Diva LLC is a limited liability company organized under the laws of Arkansas and conducting a business under the name of Farm Diva in Pulaski County, Arkansas. Plaintiff Farm Diva LLC operated its business during the relevant time hereto and continues to operate it.

Saline County, AR          CTX 000000119422          9 of 41

20.     Plaintiff First Shot LLC is a limited liability company organized under the laws of Arkansas and conducting a business under the name of First Shot in Saline County, Arkansas. Plaintiff First Shot LLC operated its business during the relevant time hereto and continues to operate it.

21.     Defendant Facebook, Inc. is headquartered at 1601 Willow Rd., Menlo Park, California 94025, and incorporated under the laws of the State of Delaware but is not registered to do business in the State of Arkansas.  Defendant Facebook Payments Inc. is also headquartered at 601 Willow Rd., Menlo Park, California 94025 and is registered as a Foreign For Profit Corporation in the State of Arkansas.  Upon information and belief, Facebook, Inc., and Facebook Payments Inc. are affiliates.

## JURISDICTION AND VENUE

22.     Plaintiffs and all proposed Class members are citizens of the State of Arkansas. Facebook, Inc., is a social media company and non-regulated public utility doing business in the State of Arkansas.  Facebook Payments, Inc., has filed as a foreign corporation with the Arkansas Secretary of State's office and is listed by the Arkansas Secretary of State's office as being in good standing.  At all relevant times hereto, Facebook, Inc., was engaged in the marketing, sale, and operation of a well-known social media and advertising network in the State of Arkansas known as and doing business under the names of the Facebook Apps (*i.e.*, Facebook, Instagram, WhatsApp, Facebook Messenger, and Audience Network, among others).

23.     The damages being claimed by Plaintiffs and the Class, exclusive of attorney's fees and costs, are below the $5,000,000 federal jurisdictional threshold under the Class Action Fairness Act.

24.     Accordingly, this Court has jurisdiction over the parties and the subject matter of this action, and venue is proper.

Saline County, AR     CTX 000000119422     10 of 41

## COMMON FACTUAL ALLEGATIONS

25.      The Plaintiffs and the Class members have business marketing accounts with Defendant. The Plaintiffs and the Class members use these accounts to advertise their businesses.

26.      Defendant derives almost all of its revenue from businesses such as those of the Plaintiffs and the Class members. As Defendant Facebook, Inc. states in its 2018 Annual Report to its stockholders: "We generate substantially all of our revenue from selling advertising placements to marketers. Our ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites." (Facebook, Instagram, and Facebook Messenger, are applications are owned by Defendant and are included within the definition of the Facebook Apps as used in this Complaint.)

27.      Defendant offers a variety of methods to advertise on the Facebook Apps, including photo ads, video ads, carousel ads, slideshow ads, connection ads, instant experience ads, lead ads (lead ads are designed for mobile devices to make it easy for people to give a business their contact information without a lot of typing), and other alternatives. Advertising on the Facebook Apps uses micro-targeting features, developed and promoted by Defendant, that allow businesses to reach an exact target audience based on demographics, location, interests, and even behaviors of the customers a business is trying to reach.

28.      The network of "followers" created by marketers using the Facebook Apps becomes more valuable to a marketer, and to Defendant, over time. When marketers are denied access to the networks they built, that constitutes a material interruption in communication with that marketer's existing and potential customers. While a marketer's access to the Facebook Apps may be interrupted, or denied altogether, intentionally by or at the whim of Defendant, Defendant

11

at all times maintains the network followers created by the marketer and uses that network for its own purposes, including the sale of access to competitors of the Plaintiffs and the Class members.

29.     Inherent in any business decision to advertise on the Facebook Apps is the size of the networks and the technology of the Facebook Apps.  More than 2.2 billion people use the Facebook Apps, and more than 95 percent of young adults on the internet use one of the Facebook Apps, making the Facebook Apps an essential advertising network for businesses.

30.     While the marketers set the targets and write the content for their advertising on the Facebook Apps, Defendant reviews the advertising and from time to time interrupts or blocks the business's advertisement.  Defendant arbitrarily or capriciously, or intentionally, ignores its own Facebook Commercial Policies to block advertising attempted by the Plaintiffs and Class members by enforcing its Facebook Commercial Policies against them but not against its larger customers (who pay Defendant more money).

31.     Plaintiff American Tiger Firearms LLC uses the Facebook Apps to advertise its retail store, merchandise offered, gun safety classes, training classes using a simulated firing range, and concealed-carry and enhanced concealed-carry permit classes.  Plaintiff American Tiger Firearms always strictly adhers to the Facebook Commercial Policies; for example, American Tiger Firearms never sells firearms on the Facebook Apps because that is prohibited by the Defendant as a condition of use of the Facebook Apps. On the other hand, advertising the existence of the American Tiger Firearms store, goods the store sells (including firearms), and classes taught at or through the store are allowed by the Facebook Commercial Policies and advertisements of such are attempted to be placed on the Facebook Apps by American Tiger Firearms. It is of particular importance to note that (a) Plaintiff American Tiger Firearms is licensed by and strictly adheres to all Federal and State laws applying to it, and (b) the concealed carry classes taught by

12

or through American Tiger Firearms are explicitly sanctioned by the State of Arkansas and constitute an essential element of the State's permitting program (those courses are taught by State-certified instructors and some if not all of the instructors have formerly served or are currently serving as law enforcement officers). In contravention of the Facebook Commercial Policies, Defendant blocks advertising by Plaintiff American Tiger Firearms on the Facebook Apps. When appeals are made, electronically (because no other method of appeal is available), to anonymous e-mail addresses within Defendant's company, no relief is given; the only explanation offered is an automatically generated statement that the advertising content does not conform to the Facebook Commercial Policies, even though the content is identical or nearly identical to (y) what had been posted on the Facebook Apps in prior years by this Plaintiff and (z) other ads posted by other marketers on the Facebook Apps. Defendant, by blocking Plaintiff American Tiger Firearms' advertising on the Facebook Apps, harms this Plaintiff by impeding this Plaintiff's sales.

32.        Plaintiff Farm Diva LLC uses the Facebook Apps to advertise its merchandise. Plaintiff Farm Diva LLC designs, creates, and offers for sale jewelry made of metal from ammunition casings. A shell casing is a component of ammunition that is made of metal, a combination of metal and plastic, or a combination of metal and paper. The casing by itself is inert; other components such as gunpowder, wadding, one or more projectiles, and oftentimes a primer must be added to make the casing into ammunition that can be used in a firearm. The metal component of the ammunition is often made of brass, but it can be made of other metals. Spent ammunition casings are left over from any kind of ammunition that is fired from a pistol, rifle, or shotgun. Plaintiff Farm Diva uses spent ammunition casings to fashion jewelry such as earrings, bracelets, and necklaces, which this Plaintiff then advertises using the Facebook Apps. Defendant blocks this Plaintiff's advertisements of jewelry while neither the jewelry nor the advertising

Saline County, AR          CTX-000000119422          13 of 41

thereof are prohibited by the Facebook Commercial Policies. Defendant blocks Plaintiff Farm Diva's access to the Facebook Apps, advising this Plaintiff in an auto-generated message that the proposed uses of the Business Tools are not allowed because they could encourage the purchase or use of guns. Defendant, by blocking Plaintiff Farm Diva's advertising on the Facebook Apps, harms this Plaintiff by impeding this Plaintiff's sales.

33.     Plaintiff First Shot LLC uses the Facebook Apps to advertise its retail store and the merchandise and services offered there, gun safety classes, training classes, and concealed-carry and enhanced concealed-carry permit classes. Plaintiff First Shot always strictly adhers to the Facebook Commercial Policies; for example, First Shot has never sold firearms on the Facebook Apps because that is prohibited by the Defendant as a condition of use of the Facebook Apps and so stated in the Facebook Commercial Policies. On the other hand, advertising the existence of the First Shot store, goods the store sells (including firearms), and classes taught at or through the store are allowed by the Facebook Commercial Policies. It is of particular importance to note that (a) Plaintiff First Shot is licensed by and strictly adheres to all Federal and State laws applying to it, and (b) the concealed carry classes taught by or through First Shot are explicitly sanctioned by the State of Arkansas and constitute an essential element of the State's permitting program (those courses are taught by State-certified instructors and some if not all of the instructors have formerly served or are currently serving as law enforcement officers). In contravention of the Facebook Commercial Policies, Defendant blocks advertising by Plaintiff First Shot on the Facebook Apps. When appeals are made, electronically (because no other method of appeal is available), to anonymous e-mail addresses within Defendant's company, no relief is given; the only explanation offered is an automatically generated statement that the advertising content does not conform to the Facebook Commercial Policies, even though the content is identical or nearly identical to (y)

Saline County AR        CTX 000000119422        14 of 41

what had been posted on the Facebook Apps in prior years by this Plaintiff and (z) other ads posted by other marketers on the Facebook Apps. These denials of service became the subject of inquiry by a local television station in response to complaints by another Arkansas gun retailer (and Class member), and in 2017 the following was reported by Little Rock television station KTHV: "We reached out to Facebook. They tell us that when posts are flagged, it is directed to their Community Operations Team. That team reviews those reports continuously. Facebook admitted to us they were wrong, saying: "We're very sorry about this mistake. The posts were removed in error. We restored them as soon as we were able to investigate. Our team processes millions of reports each week, and we sometimes get things wrong." Since the local television station intervened on behalf of Plaintiff First Shot, this Plaintiff's use of the Facebook Apps still meets with intermittent albeit continuing interference, particularly with reference to its offering of concealed carry classes. This Plaintiff has been placed in "Facebook Jail" three times, once for posting a letter to the White House that complained about Defendant's business practices. Defendant, by blocking Plaintiff First Shot's advertising on the Facebook Apps, harms this Plaintiff by impeding this Plaintiff's sales.

34.     While Defendant denies the Plaintiffs and Class members access to their respective networks on the Facebook Apps, Defendant does not interrupt access to the same services to Defendant's accounts which compete with the Plaintiffs and Class members. many of the competing marketers whose advertising is allowed by Defendant are larger than the Plaintiffs and Class members. Visitors to, people who "Like," and "Followers" of the Plaintiffs and Class members whose advertising or pages are blocked by Defendant see links to competitors of the Plaintiffs and Class members as a result of Defendant's appropriation and use of the networks built

by the Plaintiffs and Class members.  Defendant thus diverts customers or potential customers of the Plaintiffs and Class members to their (most often larger) competitors.

## CLASS ALLEGATIONS

35.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Arkansas Rule of Civil Procedure 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and (b).

36.    The proposed Class is defined as: All Arkansas residents who have commercial or business accounts with Defendant who are subject to having their advertising efforts interrupted by Defendant due to Defendant's intentional selective enforcement or erroneous, inconsistent, and capricious application of the Facebook Commercial Policies.

37.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

38.    Excluded from the Class are Defendant, and Defendant's parents, subsidiaries, affiliates, officers and directors, any entity in which any defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members, and members of the staffs of the judges to whom this case should be assigned.

39.    The members of the Class are so numerous that joinder is impractical.  While the exact number of members of the Class cannot be determined without discovery, Plaintiffs believe that the Class consists of at least hundreds of members, the identity of whom, upon information and belief, can be readily determined upon review of records maintained by Defendant.

40.    The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all members of the Class, have had their advertising blocked

by Defendant in derogation of the Facebook Commercial Policies.  As such, the factual basis of Defendant's misconduct is common to all members of the Class, and represents a common thread of bad faith, unfair and/or unconscionable conduct resulting in injury to all members of the Class and potential injury to all members of the Class.

41.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

42.     The predominating common questions of law and fact include:

a.     Whether and under what conditions or circumstances Defendant, as a general policy and business practice, arbitrarily or capriciously blocks or otherwise prevents commercial advertising on the Facebook Apps;

b.     Whether Defendant, as a general policy and business practice, allows its employees to block or otherwise prevent commercial advertising or cause it to be blocked (for example, through the design of algorithms or other code) based upon personal preferences, individual employee or companywide prejudices, or other criteria not set forth in the Facebook Commercial Policies;

c.     Whether Defendant's actions or omissions thereby deprived the Class of the advertising benefits for which they paid and to which they were entitled, thus constituting unjust enrichment;

d.     Whether Defendant's actions or omissions prior to the sale of its Business Tools, and prior to the construction by the Plaintiffs and the Class members of their respective networks, constituted constructive fraud;

17

e.      Whether Defendant allows larger, or favored, marketers to use the Facebook Apps while blocking or otherwise preventing commercial advertising using the Facebook Apps by competitors of the larger, or favored, marketer;

f.      Whether Defendant is a business or service engaged in regularly supplying the public with a service of public consequence; and

g.      Whether Defendant, as a non-regulated public utility under Arkansas law, is subject to prosecution under Arkansas Code Annotated § 4-75-301 *et seq.* as a "monopoly".

43.     Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages;

b.      The declaratory and injunctive relief to which the Class is entitled;

c.      Declaratory judgment as to the status of Defendant as a non-regulated public utility; and

d.      Declaratory judgment as to the potential for prosecution of Defendant as an unlawful monopoly.

44.     Plaintiffs' claims are typical of the claims of other members of the Class, in that they arise out of the same actions by Defendant, namely Defendant's sale of commercial advertising to the Plaintiffs and Defendant's blocking of those ads. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

45.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of businesses and other persons against Defendant and other similar enterprises. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the members of the Class.

18

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defednant's misconduct will proceed without remedy.

47.     Even if members of the Class themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
### Declaratory Judgment that Defendant is a Non-Regulated Public Utility Under Arkansas Law and Has Acted Contrary to the Rules That Govern a Public Utility

59.     Plaintiffs repeat and reallege the above paragraphs as if set forth herein.

60.     The Arkansas Supreme Court has defined a public utility as follows: "A public utility is generally defined as a business or service which is engaged in regularly supplying the public with some commodity or service of public consequence, such as electricity, gas, water, transportation, telephone or telegraph service." Arkansas Charcoal Co. v. Arkansas Public Service Com., 299 Ark. 359 (1989).

61.     Defendant is a non-regulated public utility in that (a) Defendant conducts a business that is engaged in regularly supplying the public with a service of public consequence, and (b) Defendant has as one of its determinative characteristics service to, or readiness to serve, an indefinite public or a portion of the public.

62.     Plaintiffs and the Class members are dependent upon Defendant to allow them access to the social networks they have developed on the Facebook Apps to the same extent that they are dependent upon their other public utilities to continue supplying them with access to broadcast radio advertising, telecommunications connectivity, electricity, or water.

63.     As defined in A.C.A. § 23-1-101 (9) (A), a "public utility ... includes persons and corporations ... owning or operating in this state equipment or facilities for ... (iii) Conveying or transmitting messages or communications by telephone or telegraph where such service is offered to the public for compensation...." But for the lack of an Arkansas statute specifically addressing the digital social network utility, Defendant would be a public utility subject to regulation by the Arkansas Public Service Commission.  Thus Defendant is a non-regulated public utility.

64.     Under the General Service Rules of the Arkansas Public Service Commission, revised December 8, 2015, effective February 19, 2016, certain requirements are imposed upon public utilities for the public good, including (a) a duty not to retaliate against any new or existing customer for exercising a right or enforcing an obligation created by any Commission Rule or for acting within the law, and (b) a duty not to suspend service of an existing customer except for very specific reasons enumerated under the General Service Rules.

65.     Defendant's arbitrary or capricious - or intentional - suspensions of service to the Plaintiffs and the Class members constitute breaches of the duties and obligations owed by Defendant, as a non-regulated public utility, to Plaintiffs and the Class members.  Defendant's

threats, based upon its past conduct, to the Plaintiffs and Class members to suspend or permanently block their access to their respective social networks, also constitute breaches of the duties and obligations owed by Defendant, as a non-regulated public utility, to Plaintiffs and the Class members.

66.    As a non-regulated public utility Defendant should be enjoined to conduct its operations with due and requisite regard for the good of the public.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment that Defendant is an Unlawful Monopoly Under Arkansas Law

67.    Plaintiffs repeat and reallege the above paragraphs as if set forth herein.

68.    Much as the case with any other public utility, Defendant offers for sale an infrastructural necessity for businesses where the supply conditions are such that a business may not be provided with the same or equivalent service at reasonable prices because of the monopoly Defendant now possesses.  A business's only negotiating leverage against Defendant is the amount of revenue that business represents to Defendant; if a business is a large customer, it has leverage, and its access to the Facebook Apps is not blocked by Defendant.

69.    While Defendant is a public utility, it is not regulated by the Arkansas Public Service Commission and therefore does not have the legal protections from the application of antitrust laws normally afforded a regulated monopoly.

70.    Defendant states that it had "2.27 billion monthly active users on Defendant as of September 30, 2018" ( https://newsroom.fb.com/company-info/ ).  For 2017 there were over 312 million internet users living in the United State of America, and over 240 million were subscribers to the Facebook Apps.  Within Arkansas there are over 1.9 million internet users, of whom 1.4 million use the Facebook Apps.

Saline County, AR    CTY000000110433    21 of 41

71.     As a monopoly, the Defendant exists in violation of Arkansas law: "A monopoly, as defined in § 4-75-301, is declared to be unlawful and against public policy, and any and all persons, firms, corporations, or association of persons engaged therein shall be deemed and adjudged to be guilty of a conspiracy to defraud...." (A.C.A. § 4-75-301). Defendant should therefore be declared to be a monopoly that is unlawful, existing and acting against public policy, and guilty of a conspiracy to defraud.

72.     As a monopoly, Defendant should not be allowed to conduct its operations without regard to the economic harm it causes for its customers.  By unlawfully picking and choosing larger winners and smaller losers in the access to the social networks each business has created on the Facebook Apps, Defendant is conducting itself as the prototypical monopolist for which antitrust laws were originally conceived.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, the Class members, and others similarly situated, respectfully request that this Court:

1.     Determine that this action may be maintained as a class action under Rule 23 of the Arkansas Rules of Civil Procedure, that Plaintiffs are proper class representatives, and that their counsel are appointed Class Counsel;

2.     Enter a declaratory judgment that Defendant is a non-regulated public utility;

3.     Enter a declaratory judgment that Defendant is a monopoly in violation of A.C.A. § 4-75-301 *et seq.*;

4.     Enjoin Defendant to conduct itself generally as a public utility in accordance with the duties and obligations of a public utility and specifically not to discriminate in favor of larger commercial marketers against smaller commercial marketers such as the Plaintiffs and the Class members;

5.    Enjoin Defendant to act in a manner consistent with its status as a non-regulated public utility with respect to the Class members and not in an arbitrary or capricious manner with respect to use of the Business Tools or access to the Facebook Apps by Plaintiffs or the Class members;

6.    Enjoin Defendant from retaliation against Plaintiffs for bringing this Action;

7.    Award costs and reasonable attorneys' fees pursuant to applicable law; and

8.    Award such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs and the Class hereby request a trial by jury.

Dated: April ___, 2019

Respectfully submitted,

William P. Creasman (ABN 92043)
David Slade (ABN 20130143)
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR  72201
Tel:  (501) 312-8500
Fax:  (501) 312-8505

BY: _____
        WILLIAM P. CREASMAN
        Of Counsel

By: _____
        DAVID SLADE

# EXHIBIT A

American Tiger Firearms

Bryan    Home

Page   Ad Center   Inbox   Events   Notifications 3   Insights   More   Help

**Help Your Audience Take Action**
Want more people to click the call-to-action button on your Page? You can create an ad that promotes it to the people who matter to you.

[ Promote Send Message ]

**Followers**

**Recent Promotions on American Tiger Firearms**
Activity is reported in the time zone of your ad account.

Create New Promotion

**Reach**
**Page Views**

**Boosted Post**
Looking for something I Monday at 8:00 central....
Promoted by Bryan Hearn on Nov 16, 2018
Page Preview approved

-- People Reached    -- Link Clicks    $0.00 Spent of $60.00
[ View Results ]

**Actions on Page**

**Event Promotion**
American Tiger Firearms
Saturday, June 2, 2018 at 7:20 AM
Promoted by Bryan Hearn on May 11, 2018
Not Approved

-- People Reached    -- Event Responses    $0.00 Spent of $80.00
[ View Results ]

**Events**

**Videos**

**Stories**

**Boosted Post**
We are teaming with American Tiger Firearms t...
Promoted by Bryan Hearn on Apr 5, 2018
Not Approved

-- People Reached    -- Link Clicks    $0.00 Spent of $20.00
[ View Results ]

**Messages**

**Boosted Post**
Here's our dates for the Concealed and Enhanc...
Promoted by Bryan Hearn on Apr 4, 2018
Not Approved

-- People Reached    -- Post Engagement    $0.00 Spent of $80.00
[ View Results ]

**Event Promotion**
Arkansas concealed carry class
Saturday, February 24, 2018, 7:20 AM - 5:00 PM
Promoted by Bryan Hearn on Feb 2, 2018
Not Approved

3,786 People Reached    64 Event Responses    $62.00 Spent of $62.00
[ View Results ]

**Event Promotion**
Arkansas Concealed Carry Class
Saturday, January 27, 2018, 7:20 AM - 5:00 PM
Promoted by Bryan Hearn on Jan 9, 2018
Not Approved

3,900 People Reached    76 Event Responses    $50.00 Spent of $50.00
[ View Results ]

**Event Promotion**
Arkansas concealed carry class 12/30/17
Saturday, December 30, 2017 at 7:30 AM
Promoted by Bryan Hearn on Dec 13, 2017
Not Approved

2,090 People Reached    34 Event Responses    $30.00 Spent of $30.00
[ View Results ]

Looking for all promotions for your ad account?  Go to Ads Manager

About   Create Ad   Create Page   Developers   Careers   Privacy   Cookies   Ad Choices   Terms   Account Security   Login Help   Help

Facebook © 2018
English (US)  Español  Français (France)  中文(简体)  العربية  Português (Brasil)  Italiano  한국어  Deutsch  हिन्दी  日本語

Chat (43)

# EXHIBIT B





(1) Facebook          ×    +

→   C     🔒 https://www.facebook.com

Apps    The Wall Street Jour...    PLI Continuing Leg...    Home - Supreme C...    Lexis Advance ⊃ Ho...    Wikipedia    FOIA Library - Offic...    Morgan Stanley O

f    Search

William Creasman

News Feed          •••
Messenger
Watch

Explore
Pages
Groups
Events
Fundraisers
Movies
▾ See More...

Create
Ad · Page · Group · Event ·
Fundraiser

2 Photos

Colt
5 hrs · ⊙

In the new historical crime film, The Highwaymen, the main chara
(Woody Harrelson & Kevin Costner) both carry 5 3/4" barrel, .45 C
Single Action Army revolvers as their sidearms. #MovieMonday
http://bit.ly/2UVUFyn

⊙⊙💗 1.5K                              156 Comments  9(

👍 Like          💬 Comment          ➤ Share





 (6) Facebook

https://www.facebook.com

Apps The Wall Street Jour... PLI Continuing Leg... Home - Supreme C... Lexis Advance® Ho... Wikipedia FOIA Library - Offic... Morgan

Search

William Creasman

News Feed

Messenger

Watch

Explore

Pages

Groups

Events

Fundraisers

Movies

See More...

Create

Ad · Page · Group · Event

Fundraiser

You're seeing posts from Henry Repeating Arms first.

**Henry Repeating Arms** added an event.

18 hrs ·

Join us at the 2019 NRA Annual Meeting and Exhibits! W
this will be our biggest year yet. We'll be unveiling a very
release, displaying over 50 firearms, and hosting a huge
us, you won't want to miss it.

Stop by booth #4608 to handle the Henry you've had you
the Henry team, and shake hands with MMA Superstar, D
"Cowboy" Cerrone from 10:00 AM to Noon on the 27th.

We're also proud to sponsor the NRA Foundation Nation.

**Henry at the 2019 NRA Annual Meeting**

Henry Repeating Arms · Bayonne, NJ

FRI, APR 26

8:00 AM – 5:00 PM

★ Interested

82

**Ruger**
Like This Page · Ap

Up for auction today begi
Mark I Target Model Pisto
100% of the proceeds fro
GunBroker.com #auction
Shooting - National Gove
Shooting Sports
For more info & to place a
https://bit.ly/2HTQYIN

433

Like            C

Most Relevant

 **Nikolas Koleczek**
was made in the ea

 Write a comment...
Press Enter to post.





# EXHIBIT C

## 7. Weapons, Ammunition, or Explosives

**Policy**

Ads must not promote the sale or use of weapons, ammunition, or explosives. This includes ads for weapon modification accessories.

**Examples**

- Blogs or groups connecting people with weapon-related interests, as long as the service doesn't lead to the sale of these products
- Safety courses for firearm training or licenses, and books and videos about firearm safety
- Plastic guns, swords and toy weapons
- Mounted flashlights for firearms (must set ad audience minimum age to 18 years old or over)
- Scopes and sights for firearms (must set ad audience minimum age to 18 years old or over)
- Hunting, self-defense, and military clothing and gear such as shooting targets and clay throwers (must set ad audience minimum age to 18 years old or over)
- Holsters and belt accessories (must set ad audience minimum age to 18 years old or over)
- Gun safes, mounts (including bipods), gun cases, and slings (must set ad audience minimum age to 18 years old or over)
- Equipment and protective clothing (including vests) (must set ad audience minimum age to 18 years old or over)
- Paint, coatings or wraps for weapons and magazines (must set ad audience minimum age to 18 years old or over)
- Firearms, including firearms parts, ammunition, paintball guns and bb guns
- Firearm silencers or suppressors
- Weapons of any kind, including pepper spray, non-culinary knives/blades/spears, tasers, nunchucks, batons, or weapons intended for self-defense
- Fireworks and explosives
- Ads promoting the brandishing of firearms



View Results   ○ Not Approved   | Delete Promotion

**Ad Not Approved**
Your post is still published on your Page, but it is no longer boosted because it doesn't follow Facebook's Advertising Policies.

**Order Summary**

You targeted women, ages 18 - 60 who live in 1 location, and have 2 interests.

Show full summary

This ad ran for 1 day.

Your total budget for this ad was $10.00 USD

Mandie Sherred's MasterCard *2483 will be billed.

○ Help Center                        Boost Another Post        Close

---

View Results   ○ Not Approved   | Delete Promotion

Your total budget for this ad was $5.00 USD

**303**          **25**          **$5.00**
People Reached [?]   Post Engagement [?]   Amount Spent [?]

Actions   People   Placements   Locations

Link Clicks                        5
Page Likes                         6

🎇 SALE ALERT 🎇 Now through July 4th, get 25% off your order & free shipping with coupon code AMERICA with our Red White & Bullets Sale! 🇺🇸 Shop www.farmdiva.net 🇺🇸

○ Help Center                        Boost Another Post        Close

---

View Results   ○ Not Approved   | Delete Promotion

You targeted men and women, ages 21 - 50 who live in 1 location, and have 2 interests.

Show full summary

This ad ran for 1 day.

Your total budget for this ad was $5.00 USD

**205**          **0**          **$5.00**
People Reached [?]   Event Responses   Amount Spent [?]

Actions   People   Placements   Locations

DESKTOP NEWS FEED    MOBILE NEWS FEED    MOBILE MARKETPLACE

Come See Farm Diva Ammo Jewelry at The Jonesboro Gun & Knife Show held on March 17th - 18th, 2017 in Jonesboro, Arkansas. Because every woman needs jewelry and accessories to match her gun. This gun show d... More

JONESBORO GUN SHOW

○ Help Center                                           Close

---

View Results   ○ Not Approved   | Delete Promotion

You targeted men and women, ages 21 - 65+ who live in 1 location.

Show full summary

This ad ran for 2 days.

Your total budget for this ad was $5.00 USD

**429**          **8**          **$5.00**
People Reached [?]   Event Responses   Amount Spent [?]

Actions   People   Placements   Locations

Event Responses                        6

DESKTOP NEWS FEED    MOBILE NEWS FEED    MOBILE MARKETPLACE

Come See Farm Diva Ammo Jewelry at The Saline County Gun & Knife Show held on Mar 4th - 5th, 2017 in Benton, Arkansas. Because everyone woman needs jewelry and accessories to match her gun. The show is held at... More

SALINE CO. GUN SHOW

○ Help Center                                           Close

3

# EXHIBIT D

Ballistic Jewelry | Bullet Jewelry | × (1) GunGoddess.com - Home × +

https://www.facebook.com/GunGoddess/

Apps The Wall Street Jour... PLI Continuing Leg... Home - Supreme C... Lexis Advance® Ho... Wikipedia FOIA Library - Offic... Morgan Stanley Onl... Legal News & Busi

GunGoddess.com

Liked ▾ Following ▾ Share ···

GunGoddess.com

@GunGoddess

Home

Posts

Photos

Shop

Product Reviews

Videos

Email Newsletter Sign-Up

About

Community

Info and Ads

Create a Page

GUNGODDESS.COM

43 3 Comments 3 Shares

Like Comment Share

GunGoddess.com

19 hrs ·

Have you modified your carry gun? If so, what did you upgrade?

https://www.range365.com/should-you-modify-your-carry-gun

RANGE365.COM

**Should You Modify Your Carry Gun?**

Its natural to want to add to and enhance a new firearm, but if it's a...

4

Like Comment Share

See All

Photos

I JUST WANT TO

Our Sto

Move ow shooting colorful

See Mor

Commun

38,02

38,26

About

(866)

Typic Send

www.

Shop

Sugg

Pag

Facebook is understand the people

Page

Pages Like

NRATV

/www.range365.com/should-you-modify-your-carry-gun?fbclid=IwAR2nNNSVaqjczSGevlhWJkm4ygGHOUvRhkSpJUpU4oQUd2HPcJdcfeSR54

Type here to search









